UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| JAMES H. POGUE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:14-CV-599-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| PRINCIPAL LIFE INSURANCE | ) | **MEMORANDUM OPINION AND** |
| COMPANY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Principal Life Insurance Company's Motion for

Summary Judgment. [R. 156] Plaintiff James H. Pogue filed a response, [R. 157], Principal filed its

reply, [R. 158], both parties filed supplemental briefs, [R. 159; 160], and Principal filed a reply to

Pogue's supplemental response [R. 164].[1] The matter is now ripe for resolution. For the following

reasons, the Court grants Principal's Motion for Summary Judgment.

**I. Factual and Procedural Background**

The factual background to Pogue's lawsuits against his disability insurance companies has

been previously explained in multiple opinions from this Court and the Sixth Circuit. *See Pogue v.*

*Nw. Mut. Life Ins. Co.*, No. 3:14-CV-00598-CRS, 2018 WL 1189415 (W.D. Ky. Mar. 7, 2018)

(*Northwestern*); *Pogue v. Nw. Mut. Life Ins. Co.*, No. 18-5291, 2019 WL 1376032, at \*1 (6th Cir. Feb.

7, 2019) (*Northwestern II*); *Pogue v. Principal Life Ins. Co.*, No. 3:14-CV-599-CHB, 2019 WL

---

[1] The parties originally filed their summary judgment briefing in 2018 [R. 89; 99; 109], and following remand from the
Sixth Circuit, the briefing was re-docketed at R. 156, R. 157, and R. 158. The parties' briefs cite to the record entries from
the original summary judgment briefing; however, the Court's citation to the record will refer to docket entries for the re-
docketed briefs.

1427554, at *1 (W.D. Ky. Mar. 29, 2019) (*Principal Life*); *Pogue v. Principal Life Ins. Co.*, 979 F.3d 534, 535 (6th Cir. 2020) (*Principal Life II*). In short, Pogue is a physician who formerly practiced medicine in Nashville, Tennessee. [R. 156-1] In November 2012, he stopped practicing medicine and in spring of 2013, he filed claims for benefits under his disability insurance policies with Northwestern Mutual Life Insurance Company and Principal Life Insurance Company (the defendant in this matter). [R. 156-10]; *Northwestern*, 2018 WL 1189415 at *1. In his request for benefits with Northwestern, he claimed that he suffered from a "severe anxiety disorder" and that on "Nov. 9, 2012 [he] had a total nervous breakdown and could no longer think clearly enough to continue practicing medicine." *Northwestern II*, 2019 WL 1376032, at *1. He further stated that he voluntarily chose to surrender his medical license "due to a feeling of personal incompetence to handle work stresses." *Id.* What he failed to mention was that the Tennessee Board of Medical Examiners had suspended his medical license in November 2012. [R. 156-5]; *Principal Life II*, 979 F.3d at 535. In an agreed order, the Board suspended Pogue's license for conduct that amounted to "[g]ross malpractice, or a pattern of continued or repeated malpractice, ignorance, negligence or incompetence in the course of medical practice" for prescribing or distributing painkiller narcotics to numerous patients without performing the appropriate medical examination or tests and prescribing these narcotics in such quantities and duration that such patients "would likely become addicted," as well as many other ethical failings and inappropriate conduct in his medical practice. [R. 156-5 p. 39] With this decision in hand, his insurance company (Northwestern) denied Pogue's claim for benefits because his policy did not cover disability or loss caused by the suspension of a professional license, and Pogue could not show that he was unable to practice medicine due to an actual disability rather than because he lost his medical license. *Northwestern*, 2018 WL 1189415, at *1.

Similarly, in his request for benefits with Principal, Pogue claimed a "nervous breakdown" on November 9, 2012, as well as anxiety and a few other medical issues. [R. 156-10 pp. 2-3] Principal denied Pogue's claim for benefits because he did "not meet the contractual definition of Total Disability or Residual Disability under the terms of [his] policy" with Principal. [R. 156-14] Principal's policy specifically excluded "benefits for any Injury or Sickness which in whole or in part is caused by, contributed to by, or which results from the suspension, revocation, or surrender of [an insured's] professional or occupational license or certification." [*Id.* at pp. 13-14] Like Northwestern, Principal explained in its decision letter that Pogue's "inability to perform [his] job duties is due to [his] medical license being suspended," and that even though he has documented medical concerns for several years prior to his license suspension, "it was not until [he] knew there was an ongoing investigation, that eventually resulted in the suspension of [his] medical license, that [he] stopped working," and claimed to be disabled. [R. 154-14 pp. 14-15]

Pogue proceeded to sue both insurers in Jefferson County Circuit Court alleging breach of contract, common law bad faith, violation of the Kentucky Unfair Claims Settlement Practices Act, and violation of the Kentucky Consumer Protection Act. *Northwestern*, 2018 WL 1189415, at *1; [R. 1-2]. Both suits were removed to federal court by each defendant. His suit against Northwestern reached summary judgment first, and the district court granted summary judgment to Northwestern. *Northwestern*, 2018 WL 1189415. The district court found that the suspension of Pogue's medical license caused or contributed to his alleged disability. *Id.* at *4-5. Because Pogue's policy with Northwestern unambiguously excluded benefits for a disability that was caused or contributed to by the suspension of a professional or occupational license, Pogue could not recover under the policy. *Id.* at *3-4. In the alternative, the district court also concluded that Pogue's "legal disability" (his license suspension) preceded his alleged "factual disability" (his disabling mental health issues). *Id.* at *5.

The court explained that because disability insurance policies cover factual disabilities and not legal disabilities, if a claimant becomes legally disabled before becoming factually disabled, then the claimant is not entitled to disability benefits. *Id.* On appeal, the Sixth Circuit held that "the district court correctly determined that Pogue's legal disability preceded his factual disability and granted summary judgment in favor of Northwestern Mutual on Pogue's breach-of-contract claim," and the Court declined to address whether the suspension of his medical license caused or contributed to his disability. *Northwestern II*, 2019 WL 1376032, at *4.

On March 29, 2019, this Court granted summary judgment to Principal. [R. 139] The Court held that Pogue was barred by issue preclusion from relitigating the issue of whether his license suspension had contributed to his disability because that issue had been raised and actually litigated in a prior proceeding (in *Northwestern*), the issue had been necessary to the outcome, it had resulted in a final judgment on the merits, and Pogue had a full and fair opportunity to litigate it. [*Id.*] Pogue appealed, and the Sixth Circuit reversed this Court's decision. *Principal Life II*, 979 F.3d at 535. The Court's error was that it had given preclusive effect to the district court's primary ground for summary judgment in *Northwestern* (the contribution issue), but Pogue had appealed that decision and the Sixth Circuit had affirmed on the district court's *alternative* ground (the legal disability preceding factual disability issue), the appellate court having declined to consider the contribution issue. *Id.* In those situations, as the Sixth Circuit explained, "issue preclusion does not apply to issues an appellate court declines to consider on appeal, even when the appellate court affirms the overall judgment." *Id.* at 536. "Thus, whenever an appellate court affirms on an alternative ground, 'issue preclusion no longer attaches to the ground on which the trial court decided the case, and instead attaches to the alternative ground on which the appellate court affirmed the judgment.'" *Id.* (quoting

*Jennings v. Stephens*, 574 U.S. 271, 278 (2015)). Therefore, the contribution issue that this Court had relied on had lost preclusive effect due to the Sixth Circuit's decision. *Id.*

Following remand, this Court ordered Principal's Motion for Summary Judgment and the respective response and reply briefs to be re-docketed, and for the parties to file supplemental briefing. [R. 155] This was because the Court, in applying issue preclusion in its prior order, had declined to reach several other arguments raised in Principal's summary judgment motion. Both parties have now filed supplemental briefing, raising various arguments in support of and in opposition to granting summary judgment. [R. 159; 160; 164]

## II. Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In resolving a summary judgment motion, courts view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986). When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims," at which point the non-moving party "must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon County*, 625 F.3d 935, 940 (6th Cir. 2010). The Court "need consider only the cited materials, but it may consider other materials in

the record." Fed. R. Civ. P. 56(c)(3). Where "a party fails to properly support an assertion of fact or

fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed.

Fed. R. Civ. P. 56(e).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*,

477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### III. Analysis

Principal argues that it is entitled to summary judgment because its policy excludes the

payment of benefits when a claimant's suspension of his or her professional or occupational license

causes or contributes to their disability. [R. 156-1] According to Principal, it is indisputable that

Pogue's medical license suspension at least contributed to his medical condition. [*Id.*] Similarly,

Principal argues that Pogue losing his medical license is the reason why he cannot practice medicine

and that Pogue could perform the duties of a physician up until he lost his license. [*Id.* at p. 23]

Further, Principal argues that awarding disability benefits to a claimant who has lost their license to

practice would be against public policy. [*Id.* at pp. 24-24] Last, Principal argues that a claimant under

the policy has the burden of proving entitlement to benefits and compliance with the policy's terms,

and Pogue has failed to do so. [*Id.* at pp. 24-27] In his response,[2] Pogue argues that his disability

---

[2] In Pogue's response he also moved for summary judgment in his favor. [R. 157] In his supplemental briefing he characterizes his cross-motion as "simply a redundant measure to ensure the record clearly indicated he sought judgment in his favor." [R. 160] At any rate, Principal previously filed a Motion to Strike the supposed cross-motion because it was untimely, [R. 107], and this Court granted that motion, finding that the deadline to file dispositive motions had passed prior to Pogue filing his cross-motion. [R. 139]

occurred before his license was suspended and his agreement to the suspension was "part of his treatment plan" and "did not cause or contribute to his diagnosis." [R. 157 at p. 4]

On supplemental briefing, Principal has now raised issue preclusion as grounds for summary judgment as well. Principal argues that because Pogue has already litigated the issue of whether his "legal disability" (his license suspension) preceded his "factual disability" (his mental health issues) in his case against Northwestern, issue preclusion applies and Pogue is barred from relitigating that issue here. [R. 159] Specifically, because the district court in *Northwestern* found that Pogue's license suspension predated his disability and the Sixth Circuit affirmed the decision on that ground (and issue preclusion attached), Principal argues that Pogue cannot now argue otherwise. [*Id.*]

Principal's argument is based on the rule that "[d]isability insurance policies cover factual disabilities, not legal disabilities." *Northwestern II*, 2019 WL 1376032, at *2; *see also Allmerica Fin. Life Ins. & Annuity Co. v. Llewellyn*, 139 F.3d 664, 666 (9th Cir. 1997); *Massachusetts Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688, 691 (2d Cir. 1997); 44 Am. Jur. 2d Insurance § 1474 (2021). "A legal disability includes all circumstances in which the law does not permit a person to engage in his or her profession even though he or she may be physically and mentally able to do so." *Northwestern II*, 2019 WL 1376032, at *2. For example, a legal disability may be "incarceration, the suspension of a professional license, surrendering a professional license as part of a plea agreement or to avoid disciplinary action, or practice restrictions imposed by a licensing board." *Id.* A factual disability is "an incapacity caused by illness or injury that prevents a person from engaging in his or her occupation." *Id.* When a legal disability precedes a factual disability, "the courts uniformly hold that the claimant is not entitled to disability benefits." *Northwestern*, 2018 WL 1189415 at *5. This concept is further reflected in the terms of Principal's insurance policy, which states:

> This policy does not pay benefits for an Injury or Sickness which in whole or in part is caused by, contributed to by, or which results from: . . . The suspension, revocation or surrender of Your professional or occupational license or certification . . .

[R. 157-1 p. 13]

If Pogue's legal disability preceded his license suspension, then under this rule and the language of the policy, Pogue cannot recover benefits. Principal argues that this issue has already been decided and Pogue should be barred from relitigating it. Therefore, the Court will first address whether issue preclusion applies.

### a. Issue Preclusion

As an initial matter, Pogue argues that Principal cannot raise issue preclusion in its supplemental brief and, issue preclusion aside, also cannot argue that his legal disability predated factual disability. [R. 160] This is because, according to Pogue, this Court's previous order re-docketing Principal's Motion for Summary Judgment limited the parties to only the arguments raised in Principal's original motion filed in 2018. [*Id.*] Thus, because Principal's arguments in its supplemental brief were "*not* contained in Principal's motion for summary judgment," Principal has raised "new arguments contrary to the Court's order." [*Id.* p. 6]

Pogue misconstrues this Court's prior order directing the re-docketing of the summary judgment motion and requesting supplemental briefing. The Court's order directly addressed Pogue's argument that the Sixth Circuit's reversal meant that all the other arguments the Court did not reach on summary judgment were forfeited or otherwise barred from being considered on remand. [R. 155] As the Court explained, this Court is free to consider on remand, "any issues not decided expressly or impliedly by the appellate court." *Kindle v. City of Jeffersontown, Ky.*, 589 F. App'x 747, 753 (6th Cir. 2014); *Chandler v. Specialty Tires of Am. (Tennessee), Inc.*, 134 F. App'x 921, 924 (6th Cir. 2005) ("[A]n appellate court's decision reversing summary judgment on one issue does not preclude

the district court, on remand, from granting summary judgment on other claims or issues not previously before the court of appeals."). The Court proceeded by ordering Principal's Motion for Summary Judgment and relevant briefing to be re-docketed and, since such briefing was nearly three years old, the Court ordered supplemental briefing so that the parties could raise additional arguments and issues, if necessary. [R. 155]

Even if the Court's order had limited the parties to only arguments raised in 2018, it is clear that Principal had argued in its original motion that Pogue's "inability to work was due to the loss of his license and not due to a medical condition." [R. 89 pp. 18-19] And Principal argued that its policy exclusion "is an expression of the principle that disability policies provide coverage for factual disabilities, but not for so called *legal disabilities*." [*Id.* at p. 15] Therefore, Pogue's claim that Principal is raising a "new argument" by saying Pogue's legal disability predated his factual disability is simply without merit.

Nevertheless, the Court recognizes that Principal had not raised issue preclusion as grounds for summary judgment until its supplemental briefing. Issue preclusion[3] (a form of res judicata) is an affirmative defense, Fed. R. Civ. P. 8(c), and Rule 8 generally "requires defendants to raise affirmative defenses in their first responsive pleadings" and "failure to do so may result in waiver of the defense." *Brent v. Wayne Cty. Dep't of Hum. Servs.*, 901 F.3d 656, 680 (6th Cir. 2018). But "[f]ailure to raise an affirmative defense by responsive pleading does not always result in waiver." *Id.* (quoting *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)). For example, res judicata may be raised in a motion for summary judgment. *Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981) ("[I]t is now clearly established that res judicata can also be raised by motion"). For example,

---

[3] "[I]ssue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008).

9

in *Smith v. Sushka* the defendant had failed to raise the affirmative defense of collateral estoppel until asserting it in a second motion for summary judgment. *Smith*, 117 F.3d at 969. The lower court applied collateral estoppel and the plaintiff appealed, arguing the defendant had waived this affirmative defense by failing to raise it sooner. *Id.* The Sixth Circuit explained that a defendant's late assertion of collateral estoppel was not fatal because the purpose of Rule 8's requirement is "to give the opposing party notice of the affirmative defense and a chance to respond." *Id.* Because the plaintiff had "the opportunity to fully respond to and brief the issues" on collateral estoppel, defendant's late assertion of it "did not result in surprise or unfair prejudice" to the plaintiff. *Id.*

Here, Principal could not raise issue preclusion in its first responsive pleading because the court's decision on which it is based had not yet been entered. *Northwestern*, 2018 WL 1189415; *see, e.g., Wade v. Cavalry Portfolio Servs., LLC*, No. 3:08-CV-479-S, 2010 WL 3395690, at *2 (W.D. Ky. Aug. 25, 2010) (explaining that "at the time of the initial answer" the prior court decision "upon which the defense [of res judicata] will apparently rest had not been rendered, and thus [defendant] could not have raised it in the original pleading."). And although issue preclusion may be raised in a motion for summary judgment, Principal also filed its original summary judgment motion on January 31, 2018, about five weeks before the district court's ruling in *Northwestern* and over a year before the Sixth Circuit affirmed the decision in *Northwestern II*. [R. 164 p. 3] Furthermore, it has been held that a "defendant does not waive an affirmative defense if '[h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'" *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993) (quoting *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991)). Because Pogue has had the opportunity to fully respond to this defense (and he did so in his supplemental response), the Court finds no unfair prejudice or surprise.

Furthermore, even if Principal had failed to raise the affirmative defense in a timely manner, the Court could consider issue preclusion *sua sponte*. The Supreme Court has indicated that a court may assert a res judicata defense on its own motion in "special circumstances." *Arizona v. California*, 530 U.S. 392, 412 (2000).

> "Most notably, if a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte,* even though the defense has not been raised. This result is fully consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste."

*Id.*; *see also Hutcherson v. Lauderdale Cty., Tennessee*, 326 F.3d 747, 757 (6th Cir. 2003) (finding "special circumstances" where the defense of res judicata was "not available to Defendants prior to their filing their motion for judgment on the pleadings" but both parties had the opportunity to respond to the defense.). If the issue presented in *Northwestern* and the issue presented here are the same, then the Court has notice of this previously decided issue and these "special circumstances" would warrant raising issue preclusion on its own motion. Further, issue preclusion was not available to Principal at the time it filed its Motion for Summary Judgment in 2018 and both parties have now had an opportunity to brief the issue. Therefore, the Court rejects Pogue's argument that considering issue preclusion would be improper and will proceed to determine whether it applies.

Generally, "[u]nder the doctrine of issue preclusion, 'the determination of a question directly involved in one action is conclusive as to that question in a second suit.'" *Sumeru Health Care Grp., L.C. v. Hutchins*, 657 F. App'x 381, 385 (6th Cir. 2016) (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1302 (2015)). This means that "parties get only one chance to litigate an issue of fact or law." *Principal Life II*, 979 F.3d at 536. The Sixth Circuit has established a four-part test for determining whether and when issue preclusion bars the re-litigation of an issue:

> 1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;

2) determination of the issue must have been necessary to the outcome of the prior proceeding;
3) the prior proceeding must have resulted in a final judgment on the merits; and
4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir. 2003).

Pogue disputes the first, second, and fourth factor. [R. 160 pp. 11-18] He argues that the issue decided in *Northwestern* on whether his license was suspended before or after he became disabled is not *identical* to the issue here. [R. 160 pp. 13-14] The main difference, according to Pogue, is that the policy language relevant in *Northwestern* is similar but not identical to Principal's policy language. [*Id.*] The definition of disabled in *Northwestern* was "unable to perform the principal duties of the regular occupation," whereas Principal's policy defines disabled as "unable to perform the substantial and material duties of Your Occupation" [*Id.* p. 14] This is a distinction without a difference. The Court perceives no fundamental or material difference in the "principal duties" of a physician and the "substantial and material duties" of one.[4] Pogue argues that "principal duties" are those that are "most important" and "substantial and material" duties are those that are "significantly great." [*Id.*] Yet he fails to explain how these virtually synonymous terms are meaningfully different, other than simply asserting that they are. Furthermore, the issue decided in *Northwestern* was one of historical fact—which occurred first in time: Pogue's medical issues reaching the point where they prevented him from practicing medicine or the investigation and suspension of Pogue's license that prevented him from practicing medicine? The district court and the Sixth Circuit have said the latter. That same

---

[4] For example, an analogous principal is that "issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4417, p. 449 (2d ed. 2002). The Supreme Court in *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015) agreed with this rule but explained that where the different legal standards were similar but not "fundamentally different" and only involved "minor variations" that did not change the "essence" of the standard, these differences "do not defeat preclusion." The same idea is applicable here. The policy language has minor differences in terms, but both essentially ask whether a claimant can or cannot perform the main duties of his or her occupation. *See, e.g. Prudential Ins. Co. of Am. v. Harris*, 254 Ky. 23, 70 S.W.2d 949, 951 (1934).

question is now before the Court; therefore, the issue decided in *Northwestern* is identical to the issue here.

With respect to the second factor, Pogue argues that the district court's decision on whether his legal disability predated his factual disability was not essential or necessary to the outcome because it was an alternative and independent ground for the district court's ruling. [R. 160 p. 15] Pogue quotes the *Second Restatement*'s rule that if a court's decision is "based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." Restatement (Second) of Judgments at § 27 cmt. i (Am. L. Inst. 1982). This is so because either determination can independently support the decision, and so neither are strictly *necessary* to the result. And it is true that the district court's decision in *Northwestern* determined two issues, either of which could independently support summary judgment. However, that is not all. The *Second Restatement* also states that if an "appellate court upholds *one* of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination." § 27 cmt. o (emphasis added); *Principal Life II*, 979 F.3d at 536 (6th Cir. 2020) (explaining issue preclusion "attaches to the alternative ground on which the appellate court affirmed the judgment."); *Jennings*, 574 U.S. at 278. Indeed, the Sixth Circuit has already explained that this is precisely what occurred in *Northwestern* on appeal. *Principal Life II*, 979 F.3d at 536. Therefore, the issue of whether his legal disability predated his factual disability was necessary to the outcome of the prior proceeding and Pogue's argument on this point is without merit.

Last, Pogue argues that he did not have a "full and fair opportunity to litigate" the issue in *Northwestern* because the court ruled against him on a discovery issue and he was not permitted to present questions to a jury. [R. 160 p. 16] "[A] full and fair opportunity to litigate entails . . . the

13

procedural requirements of due process." *In re Leonard*, 644 F. App'x 612, 618 (6th Cir. 2016) (quoting *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 483 n.24 (1982)). A court may find that a party lacked a full and fair opportunity when "there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Kremer*, 456 U.S. at 480. There is no reason to doubt the fairness of the procedures in *Northwestern*, particularly when Pogue appealed that decision and the Sixth Circuit affirmed. *See, e.g., George v. Hargett*, 879 F.3d 711, 719 (6th Cir. 2018) ("Plaintiffs fall far short of demonstrating how the denial of discovery could be deemed to have resulted in fundamental unfairness. If it had, their recourse lay in appellate review. . . . If any unfairness resulted, it was not for lack of a full and fair opportunity to litigate."). Even though Pogue maintains that the decision in *Northwestern* was wrongly decided, "issue preclusion prevent[s] relitigation of wrong decisions just as much as right ones." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 157 (2015). Moreover, Pogue vigorously litigated the issue of whether his legal disability predated his factual disability in both district court and again on appeal. He was given a full and fair opportunity to litigate the issue, and he took the full opportunity to do so. His argument otherwise is meritless.

Therefore, the Court finds that all four factors are met, and issue preclusion applies to the issue of whether Pogue's legal disability predated his factual disability. This precise issue was raised and actually litigated[5] in *Northwestern*; the court reached summary judgment in favor of the defendant which serves as a final judgment on the merits. *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 910 (6th Cir. 2001) ("[S]ummary judgment is recognized as a final judgment for the purpose of issue preclusion."). Pogue had a full and fair opportunity to litigate the issue in *Northwestern* and following appellate review—which affirmed the district court's decision solely on this ground—issue

---

[5] "An issue is actually litigated when it 'is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'" *In re Leonard*, 644 F. App'x 612, 616 (6th Cir. 2016).

preclusion attached. "[P]arties get only one chance to litigate an issue of fact or law." *Principal Life II*, 979 F.3d at 536. Pogue had his one chance, he lost, and he is now barred from relitigating the issue here.

Because Pogue is barred from arguing that his legal disability did not precede his factual disability, the Court will grant summary judgment in favor of Principal on Pogue's breach-of-contract claim.

### b. Summary Judgment

Alternatively, even if the Court were to determine that issue preclusion does not apply, the Court would still find that there is no genuine issue as to any material fact and that Principal is entitled to judgment as a matter of law under Rule 56(a). Principal Life's policy with Pogue provides benefits for disability caused by an "Injury or Sickness" that precludes the ability to work. However, the policy contains an exclusion:

> This policy does not pay benefits for an Injury or Sickness which in whole or in part is caused by, contributed to by, or which results from: . . . The suspension, revocation or surrender of Your professional or occupational license or certification.

[R. 156-1 at 15] According to Principal, because there is no genuine dispute that the suspension of Pogue's medical license either caused in whole or in part or "contributed to" Pogue's disabling "Injury or Sickness," the policy exclusion applies, and Pogue is not entitled to benefits. The Court agrees.

Pogue claims to have suffered from a "nervous breakdown" on November 9, 2012 and from that point forward he has been too disabled to work. Further, Pogue claims the near simultaneous suspension of his medical license with the alleged onset of his disability did not cause or contribute to his disability. He attempts to reframe his license suspension as a voluntary "surrender" of his license

that he agreed to "as part of his treatment plan." [R. 157 at 4] The undisputed record evidence clearly shows otherwise.

The medical board filed a Notice of Charges against Pogue on July 19, 2012. [R. 156-6] As part of the investigation, Pogue was deposed on October 29, 2012, less than two weeks before his alleged nervous breakdown. [R. 156-8] On November 21, 2012, he signed an agreed order suspending his medical license. [R. 156-5] In addition to the suspension of his license, Pogue was required submit to an evaluation by the Vanderbilt Comprehensive Assessment Program (VCAP). In April 2013 he did so and the VCAP Evaluation Report documented Pogue's own report on the events leading up to his license being suspended:

> Dr. Pogue reported that he was feeling increasingly overwhelmed. The Medical Board responded to complaints [from Pogue's patients] by reviewing a number of his charts in which patient care and documentation issues (lack of adequate physical examination, lack of appropriate consultation) were identified. He said that the Board continued to ask for charts for review and he was becoming increasingly stressed. He said his blood pressure was increasing, he was not sleeping, his cortisol levels were increasing, and he was breaking down emotionally. He ended up "having a nervous breakdown in my lawyer's office" and they decided to propose a consent order to the Board. The Order, dated November 2012, stipulates that his medical license be suspended for 6 months followed by 5 years of probation, that Dr. Pogue undergo an evaluation at VCAP, surrender his DEA license for 6 months, take a medical records keeping course, and pay a fine.

[*Id.* at 52] This report, based on Pogue's own account, clearly shows that the investigation and eventual suspension of his medical license created stress and emotional problems that led to Pogue's "nervous breakdown" and inability to work. In other words, the investigation and suspension of his license *contributed to* his mental condition. Pogue now tries to change his story and recast his medical license suspension as part of his "treatment plan," rather than a cause or contributing factor to his mental deterioration. But the record does not support his new version of events. The first physician Pogue visited (only eleven days after his nervous breakdown on November 9, 2012) was Dr. Stephen Adams who noted that Pogue reported having been "under extraordinary stress for the

past year, and was severely fatigued" with "some PTSD type symptoms related to . . . [the] TN Board of ME evaluating his prescribing practices . . . ." [R. 156-16 at 2]. On November 26, 2012 (five days after Pogue's license was suspended) Pogue's treating psychiatrist, Dr. Asta, documented in his records that he "[r]eceived message that [Pogue] has decompensated earlier this month. . . . Speculate that [Pogue and his wife] are having severe marriage difficulties and he is having stress due to the medical board and his work." [R. 110-2 at 123] Later on, when Pogue applied for disability benefits with Principal Life, Dr. Asta filled out a psychiatric questionnaire in May 2013 and indicated that Pogue's "medical license suspended" (among other personal issues) were "contributing to the patient's condition." [R. 156-12 at 4] Dr. Asta similarly indicated on a questionnaire Pogue submitted for benefits with another insurance company (Northwestern) that Pogue was a "physician who decompensated" after a few events in his life, including "suspended medical license in 2012" alongside increased anxiety and depression, and Pogue was prevented from returning to work by "professional + ethical violation Tenn dept of health." [R. 156-13] During his deposition, Dr. Asta reiterated the same story: Pogue was under enormous stress due to a variety of issues in his life, including the investigation into his medical practice and the eventual suspension of his license, and these stressors culminated in Pogue's mental health deteriorating significantly. [R. 156-3] The Court finds that the undisputable evidence in the record shows that the suspension of Pogue's medical license caused or contributed to his disability.

Pogue attempts to rebut these facts by relying on *post hoc* affidavits from Dr. Asta, Dr. Cecil, Dr. Voor, and Dr. Gallagher, as well as an Administrative Law Judge's decision to award benefits under the Social Security Act. Principal has objected to all of these affidavits and the ALJ's decision and argues that the Court should find them inadmissible as unreliable or otherwise insufficient to create a genuine dispute of material fact. [R. 90; 110; 111; 112; 113]

### i. Dr. Asta's Declaration

Pogue relies on a March 2018 affidavit from Dr. Asta which states that Pogue's "underlying medical conditions and symptoms were the root cause of his improper prescription and patient documentation issues that led to the Tennessee Medical Board's investigation." [R. 157-3] Further, Dr. Asta states that he "provided [Pogue] with ongoing appropriate medical treatment" between July 2012 and February 2013 and, in November 2012, Dr. Asta "felt Dr. Pogue should not continue practicing medicine" and "advised Dr. Pogue to take time off work." [*Id.*] Dr. Asta frames Pogue's "willingness to forgo his medical license, to not contest the medical board's claims" as "a good first step in his treatment plan" and "the suspension of his medical license was a necessary part of his treatment plan." [*Id.*] Thus, Dr. Asta's declaration suggests a version of events where, in November 2012, he advised Pogue to stop practicing medicine and developed a "treatment plan" where Pogue would willingly surrender his medical license in order to "treat" his mental condition.

Principal objects to the 2018 declaration, arguing that it directly contradicts Dr. Asta's 2017 deposition and that Pogue is attempting to create a "sham fact issue." [R. 110] The Court agrees. A post-deposition affidavit that directly contradicts the affiant's earlier deposition "should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). If there is no direct contradiction, then the court should generally not strike or disregard the affidavit unless the court still determines that the affidavit "constitutes an attempt to create a sham fact issue." *Id.*; *see also Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 619 (6th Cir. 2001) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony.").

18

Here, Dr. Asta's declaration contradicts or mischaracterizes his earlier notes and testimony. For example, in his 2017 deposition Dr. Asta testified that he did not see Pogue between July 2012 and February 2013; he only spoke with him and his wife on the phone on November 26, 2012 (five days after Pogue signed the agreed order suspending his medical license) and Dr. Asta "advised him to take some time off from work, but I didn't say that you shouldn't work" because Dr. Asta "didn't know how bad his situation was at that time," and instead simply told Pogue to "take time, relax, come back in the office." [R. 110-2 at 40-42] A few months later, when Pogue attended an in-person visit in February 2013, Dr. Asta testified that even then Pogue did not tell him that he had experienced a "nervous breakdown" but did share that his license had been suspended. [*Id.*] Nevertheless, according to Dr. Asta, Pogue "felt that the board was wrong and he was going to fight this . . . He was still optimistic that his practice would still continue to go forward . . .[Pogue] felt that he was still in charge and could still take care of things, get things done." [*Id.* at 43] When asked if Dr. Asta believed Pogue had a nervous breakdown, he testified "[y]eah, eventually, afterwards" and explained that Pogue had been "in denial about what was going on in his situation," such as the medical board's investigation and suspension of his license, and Pogue believed he could "take care of all this stuff," "fight" the suspension, and still move forward. [*Id.*] Then, according to Dr. Asta, "[i]t was later he started decompensating in the office" and Dr. Asta noted Pogue was becoming more depressed and "eventually he just completely wound out." [*Id.*]

Dr. Asta's deposition clearly contradicts his 2018 declaration and his declaration contains no sufficient explanation for these inconsistences. Accordingly, the Court will not consider the contradictory and misleading statements in Dr. Asta's 2018 declaration that Pogue relies on.

**ii. Dr. Cecil**

As an initial matter, the Court notes that the first portion of Dr. Cecil's declaration was executed on March 2, 2018—thirty days *after* Principal had filed its Motion for Summary Judgment.[6] *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011) ("District courts have broad discretion to exclude untimely disclosed expert-witness testimony[.]"). Further, Principal filed a Motion to Exclude the remainder of Dr. Cecil's declaration. [R. 90] Principal argues that Dr. Cecil's testimony is inadmissible under Federal Rule of Evidence 702 because it is not based on sufficient facts already in evidence and amounts to "bare conclusions" and "guesswork and speculation." [*Id.*] Although Dr. Cecil concludes that Pogue suffered brain trauma, Principal points out that "there is no evidence that [Pogue] suffered from a traumatic brain injury or a concussion anywhere in the medical record amassed during Principal's review of [Pogue's] claim and obtained during fact discovery." [*Id.* at 8] None of Pogue's treating physicians have described, documented, or treated any incidents of prior trauma or brain injury, yet Dr. Cecil concludes that Pogue's "brain injury" is the cause of his "functional limitations." [*Id.*]

Federal Rule of Evidence 702 governs the admissibility of expert testimony and it states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

---

[6] Dr. Cecil's declaration, as relied on by Pogue in his response to Principal's Motion for Summary Judgment, consists of four pages of statements, executed on March 2, 2018, and an attached declaration by Dr. Cecil from Pogue's prior lawsuit against Northwestern, executed August 8, 2016. [R. 157-6]

District courts serve as "gatekeepers" under Rule 702 to ensure that expert witness opinions meet the thresholds for reliability and relevance. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Further, district courts have "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination," but must assess the "principles and methodology" used by experts, not just the conclusions they ultimately reach. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 595. Ultimately, a district court must "ensure[] that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397, 403 (6th Cir. 2012) (internal quotation omitted).

Principal argues that Dr. Cecil's opinions are "bare conclusions" and unreliable. The Court agrees. This Court, in *Pogue v. Northwestern*, No. 3:14-CV-00598-CRS, 2017 WL 4227657 (W.D. Ky. Sept. 22, 2017) found that the identical report from Dr. Cecil used for similar purposes was unreliable. This Court explained that Dr. Cecil's conclusion that Pogue suffers from brain trauma was "at most a 'working hypothesis' and does not rise to the level of 'scientific or technical knowledge' required under Rule 702." *Id.* Further, the Court found that Dr. Cecil's primary basis for his conclusion was that a 3T MRI of Pogue's brain showed "corpus callosal tract cutoffs that *could* be associated with trauma," but Dr. Cecil did not establish to any reasonable degree of certainty that the corpus callosal tract cutoffs were caused by brain trauma. *Id.* Instead, Dr. Cecil "leaps to the conclusion that Pogue's limitations are the result of brain trauma" and this "'*ipse dixit* of the expert alone is not sufficient to permit the admission of an opinion." *Id.* (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 669 (6th Cir. 2010)). Indeed, Rule 702 requires that an expert's opinions be "supported by appropriate validation—i.e. 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 589. This Court found that "Dr. Cecil does not have an adequate scientific or factual basis for

opining that Pogue's alleged limitations are the result of brain trauma," and this Court agrees and adopts the same reasoning. From there, Dr. Cecil's other conclusions—that Pogue is incapable of returning to the practice of medicine and that his condition has existed since November 9, 2012—are without foundation because they rely on the unsupported conclusion that Pogue suffers from brain trauma. Accordingly, the Court will grant Principal's Motion to Exclude Dr. Cecil's report and declaration.

### iii. Dr. Voor

Pogue also relies on a report from Dr. Voor who performed an evaluation of Pogue in April 2017 and reviewed his medical records, concluding that Pogue's mental condition was "not caused by, contributed to by, or the result of the loss of his medical license." [R. 157-7] Principal argues that Dr. Voor's report and declaration are also unreliable because her conclusions rely on Dr. Cecil's report[7] and otherwise lack support. [R. 90] The Court agrees. Dr. Voor's report consists of a rehearsal of Pogue's medical background, the results of tests performed, and then conclusions. Although Dr. Voor makes the conclusory statement that Pogue's mental conditions "were not caused by the loss of his medical license," her report also concluded that Pogue's "mental health further declined in the fall of 2012" and this "decline in his mental health" is "attribute[d] . . . to the death of his father, medical practice financial difficulties, and investigation by the Tennessee Board of Medicine." [R. 90-3 at 17] Alongside these contradictory conclusions, Dr. Voor's report fails to explain what specific medical records or other information support her conclusions or what methodology she used to reach these conclusions. It is not the court's role to fill in the "analytical

---

[7] Dr. Voor's report also relies on the findings of an ALJ for the Social Security Administration that (as the Court explains below) is unreliable because, in part, it relies heavily on the *post hoc* contradictory and inconsistent statements of Dr. Asta. [R. 157-11] Dr. Voor's report also relies on SSA consultative examiner Dr. Lear's report that in turn was based on an exam of Pogue in September 2013 and is therefore less relevant to Pogue's mental condition from ten months earlier in November 2012.

gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Rodrigues v. Baxter Healthcare Corp.*, 567 F. App'x 359, 361 (6th Cir. 2014) ("[T]his unexplained conclusion failed to connect the dots . . ."). As the Sixth Circuit explained in *Vaughn v. Konecranes, Inc.*, 642 F. App'x 568, 577 (6th Cir. 2016), Dr. Voor "lists the documents [she] reviewed to reach [her] conclusions" but the report does not explain *how* show reached those conclusions, and because they are of a "conclusory nature" the Court may "refuse[] to allow them into the record." Accordingly, the Court will grant Principal's Motion to Exclude with respect to Dr. Voor's report and declaration. [R. 90]

### iv. Dr. Gallagher

Pogue relies heavily on the opinion of Dr. Gallagher, who was a medical consultant hired by Principal to review Pogue's medical records and to provide an opinion on Pogue's benefit claims. [R. 157 at 2] Principal objects to Pogue's reliance on Dr. Gallagher's deposition testimony and memorandum because Dr. Gallagher was never disclosed by Pogue as one of his opinion witnesses and is therefore inadmissible under Rule 37(c)(1). [R. 111] The Court agrees. Pogue listed four witnesses on his Rule 26(a)(2)(B) and (C) disclosures: Dr. Asta, Dr. Lewis, Dr. Cecil, and Dr. Voor. [R. 111-1] "[A] party that fails to disclose information required by Rule 26 is not, unless such failure is harmless, permitted to use as evidence any witness or information not properly disclosed." *Harville v. Vanderbilt Univ., Inc.*, 95 F. App'x 719, 725 (6th Cir. 2003) (citing Fed. R. Civ. P. 37(c)(1)). Pogue admits that he "did not disclose Dr. Gallagher by name in his Rule 26 disclosures," but argues that he incorporated "[a]ll persons identified in Defendant's respective disclosures" in his Rule 26(a) initial disclosures and that because Principal, in turn, identified Dr. Gallagher in its own Rule 26(a) initial disclosures, he sufficiently disclosed Dr. Gallagher by reference and incorporation. [R. 120 at 4] This circuitous route to disclosing an expert witness to the opposing party is

insufficient. Rule 26(a)(2) requires a party to "disclose to the other parties the *identity* of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Pogue's argument that he satisfied this requirement is without merit.

Nevertheless, even if Pogue's failure to disclose were harmless and Dr. Gallagher's memorandum were admissible, it fails to sufficiently create a genuine dispute of material fact. Dr. Gallagher's memorandum explains that Pogue was claiming disability as of the date of his "nervous breakdown" caused by "his world collapsing about him" which "included the surrender of his [medical] license essentially due to allegations of improper prescribing, failure to document and examine, etc." [R. 157-2 at 14] Dr. Gallagher went on to state that Pogue was "probably" unable to "work safely as a physician in November of 2012 and probably not currently." [*Id.* at 16] Lastly, he explained that "legal issues aside," Pogue was still "too symptomatic of anxiety and panic" to return to work, as of July 2013 (the date of Dr. Gallagher's review and memorandum). Construing Dr. Gallagher's memorandum in the light most favorable to Pogue, the memorandum only shows that Dr. Gallagher recognized Pogue's "nervous breakdown" was caused by a variety of problems in Pogue's life, including the "surrender of his license," and that Pogue "was having a great deal of trouble in November of 2012," which caused or exacerbated his mental health problems such that Pogue "probably could not work safely as a physician in November 2012." [R. 157-2] The rest of Dr. Gallagher's memorandum is a rehearsal of the medical records he reviewed and his conclusion that Pogue could not presently return to work.

Pogue misleadingly quotes Dr. Gallagher's opinion to suggest he concluded Pogue "probably could not work safely as a physician in November 2012 . . . legal issues aside," emphasizing the "legal issues aside" language. The argument here is that Dr. Gallagher concluded that Pogue's "legal issues" did not cause or contribute to his mental condition in November 2012, but that is a

mischaracterization of his report. Read in context, Dr. Gallagher was stating his opinion that as of *July 2013* (the time of his review and memorandum) he doubted Pogue could return to work because he was currently "too symptomatic of anxiety and panic to function effectively in a busy medical workplace" even without the "legal issues" preventing him from practicing medicine. This does not create a genuine dispute as to whether the suspension of Pogue's medical license caused or contributed to his mental condition in November 2012.

To survive a summary judgment motion, Pogue "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and the "mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to demonstrate a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Pogue's reliance on Dr. Gallagher's opinion—emphasizing vague language or pulling his words out of context—is clearly not enough.

### v. Social Security Administration's decision

Pogue cites to the findings and conclusions of an ALJ who found that Pogue's disabilities prevented him from working under the Social Security Act and the onset date of his disability was November 9, 2012. [R. 157-11] In *Northwestern*, Pogue also tried to rely on the same ALJ's decision. *Northwestern*, 2018 WL 1189415, at *5. This Court rejected Pogue's reliance on the ALJ's decision, explaining:

> "[T]he inquiry into an individual's disability for purposes of determining social security benefits is different than it is for purposes of determining benefits under a long-term disability insurance policy. The SSA judge and evaluators did not have access to all of the evidence presented in this case. In fact, the SSA decision was largely based on Pogue's own statements and Dr. Asta's 2017 declaration, which has been called into question by this court."

*Id.* The same reasoning applies here, and the Court finds the ALJ's decision has minimal probative value and the ALJ's conclusions with respect to Pogue's disability are unreliable. *See Roach v.*

*Hughes*, No. 4:13-CV-00136-JHM, 2016 WL 9460306, at *4 (W.D. Ky. Mar. 9, 2016) (finding SSA

decision inadmissible because the "lack of a meaningful adversarial process with respect to the cause,

existence[,] and extent of a plaintiff's alleged disability renders the SSA's conclusions on that issue

unreliable."). For example, the ALJ's decision relied heavily on the opinion of Dr. Asta which

included the same statements Dr. Asta made in his 2018 declaration and (as the Court has already

explained) contradicted his earlier deposition testimony and documents. The Court finds the ALJ's

decision to be unreliable and insufficient to create a genuine dispute of material fact.

Because it is clear that the suspension of Pogue's medical license at least caused in part or

contributed to his mental condition and disability, the unambiguous policy exclusion applies and

expressly precludes the payment of benefits. Therefore, Principal is entitled to summary judgment on

Pogue's breach-of-contract claim.

### IV. Bad Faith Claims

Along with his breach-of-contract claim, Pogue also sued for various bad faith claims. [R. 1-2]

On November 30, 2015, this Court bifurcated Pogue's contract claim from his bad faith claims. [R.

25] Following the Court's March 29, 2019 Order granting summary judgment on Pogue's breach of

contract claim, the Court also granted summary judgment on Pogue's bad faith claims in favor of

Principal. [R. 146] As the Sixth Circuit explained on review, "when the district court determined that

Principal wasn't obligated to pay, it held that Pogue's bad-faith claims could not succeed." *Principal

Life II*, 979 F.3d at 536–37. However, when the Sixth Circuit reversed this Court's grant of summary

judgment on Pogue's breach-of-contract claim, it also held that "his bad-faith claims no longer fail as

a matter of law." Therefore, on remand, Pogue's bad faith claims remain outstanding.

"Under Kentucky law, an insurer cannot act in bad faith if the insurer did not have to pay in

the first place." *Principal Life II*, 979 F.3d at 536 (citing *State Auto Prop. & Cas. Ins. Co. v. Hargis*,

785 F.3d 189, 197–98 (6th Cir. 2015)). "At a minimum, an insurer that has no obligation to pay under the policy also defeats a claim for bad faith." *State Auto*, 785 F.3d at 198; *see also Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000) ("Absent a contractual obligation, there simply is no bad faith cause of action, either at common law or by statute."); *Brantley v. Safeco Ins. Co. of Am.*, No. 1:11-CV-00054-R, 2011 WL 6012554, at *3 (W.D. Ky. Dec. 1, 2011) (explaining that under Kentucky law "[plaintiff's] claims of bad faith will evaporate if he is not entitled to recovery under the policy."). Because the Court finds that Principal did not have to pay benefits to Pogue under the policy, Pogue's remaining bad faith claims must fail as a matter of law. Therefore, the Court will grant summary judgment in favor of Principal on Pogue's bad faith claims as well.

**IT IS ORDERED:**

1.      Defendant Principal Life Insurance Company's Motion for Summary Judgment **[R. 156**] is **GRANTED**.

2.      A separate Judgment will be entered consistent with this Order.

This the 2nd day of August, 2021.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc:  Counsel of Record